## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 16-cv-3298 |
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, et al., | ) ) ) ) | |
| Defendants. | ) ) | |
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 14-cv-3040 |
| HOLLIS SHAFER et al., | ) ) | |
| Defendants. | ) ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

This matter comes before the Court on Westfield Insurance

Company's (Westfield) Motion for Summary Judgment (Case No. 14-

3040 d/e 100, Case No. 16-3298 d/e 90) (Westfield Motion),

Indemnity Insurance Company of North America's (Indemnity or IINA) Motion for Summary Judgment (Case No. 14-3040 d/e 92, Case No. 16-3298 d/e 102) (Indemnity Motion), and Star Insurance Company's (Star) Motion for Summary Judgment (Case No. 14-3040 d/e 94, Case No. 16-3298 d/e 104) (Star Motion) (collectively the Motions). These two cases, Case No. 14-3040 (2014 Declaratory Action) and Case No. 16-3298 (2016 Declaratory Action) have been consolidated through discovery and resolution of dispositive motions. Opinion entered March 7, 2017 (Case No. 16-3298 d/e 39), at 7-8. This Court enters this Opinion to be filed in both cases.

Indemnity, Westfield, and Star (collectively the Insurance Companies) at various points in time provided commercial general liability insurance to Sandstone North, LLC (North) and Sandstone South, LLC (South) (collectively Sandstone). North and South merged into a single entity in 2010. Sandstone operated hog confined area feeding operations (Hog Facilities or CAFOs) in Scott County, Illinois. Brian Bradshaw, Eric Bradshaw, and Hollis Shafer had ownership interests in Sandstone.

On June 1, 2010, the neighbors of the Sandstone Hog Facilities brought a nuisance action against Sandstone in Scott

County, Illinois, Circuit Court.  <u>Alvin Marsh, et al. v. Brian R. Bradshaw, et al.</u>, Scott County, Illinois Case No. 2010-L-3 (Underlying Action).  Westfield and Star each agreed to pay the defense costs in the Underlying Action under a reservation of rights. Indemnity initially agreed to defend Sandstone in the Underlying Action under a reservation of rights, and Indemnity also filed a declaratory judgment action challenging whether Indemnity had a duty to defend Sandstone.  Sandstone withdrew its tender of the defense to Indemnity in November 2010, and Indemnity voluntarily dismissed the declaratory judgment action.  Sandstone re-tendered the defense to Indemnity in December 2013.  Indemnity filed the 2014 Declaratory Action in response.  In 2016, Sandstone prevailed at trial in the Underlying Action, and the matter is on appeal. Westfield then filed the 2016 Declaratory Action in this Court. Westfield and Star ask the Court to declare that Indemnity must reimburse them for part or all of the defense costs.  Indemnity asks the Court to declare that Indemnity is not obligated to pay any defense costs for the Underlying Action.

For the reasons set forth below, the Westfield and Star Motions are GRANTED in part, and the Indemnity Motion is

DENIED. The Court finds that Sandstone withdrew the tender of the defense to Indemnity in November 2010, and thereby relieved Indemnity of a duty to defend the Underlying Action at that time. The Court further finds that Sandstone's December 2013 re-tender was effective because it was reasonable under the circumstances. Indemnity must pay Westfield and Star a pro rata share of the defense costs incurred for the Underlying Action. Westfield and Star are also entitled to prejudgment interest from the date of the re-tender, December 17, 2013. However, Indemnity is not required to reimburse Westfield and Star for all defense costs of the Underlying Action.

Star has also filed an original and corrected Motion to Strike Certain [Indemnity] Reply Brief Arguments on Grounds of Improper Sandbagging or, in the Alternative, for Leave to File a Sur-Reply to Those Arguments (Case No. 14-3040 d/e 118, Case No. 16-3298 d/e 107 and 108) (collectively Motion to Strike). In reaching this decision, the Court did not consider the arguments Star seeks to strike. As such, the Motion to Strike is DENIED as moot.

## STATEMENT OF FACTS

Sandstone began operating its Hog Facilities in 2007. At various times, Sandstone bought insurance policies from Westfield and Indemnity. Sandstone also was a named additional insured in policies issued by Star. All of the insurance policies issued by the Insurance Companies (collectively the Policies) had one-year terms. Sandstone, however, cancelled some of the Policies before the one-year terms expired.

On April 24, 2007, Westfield issued two insurance policies to Sandstone, one to North and one to South (07-08 Westfield Policies). On April 24, 2008, Westfield issued a second set of insurance policies to Sandstone, one to North and one to South (08-09 Westfield Policies) (collectively the Westfield Policies). Sandstone cancelled the 08-09 Westfield Policies on November 12, 2008. Indemnity Motion, Exhibits C-1, C-2, C-3, and C-4, Westfield Policies.

On November 12, 2008, Indemnity issued its first set of policies to Sandstone, one for North and one for South (08-09 Indemnity Policies). On November 12, 2009, Indemnity issued a second set of policies to Sandstone (09-10 Indemnity Policies). On

February 10, 2010, Sandstone canceled the 09-10 Indemnity Policy issued to South when South merged into North.  On November 12, 2010, Indemnity issued a single policy to the now-merged Sandstone (10-11 Indemnity Policy).  Thereafter, Indemnity issued policies to Sandstone on November 12, 2011 (11-12 Indemnity Policy), and November 12, 2012 (12-13 Indemnity Policy) (collectively the Indemnity Policies).  2016 Declaratory Action Complaint, Exhibits 1 through 8, Indemnity Policies.

One of the owners of Sandstone, Brian Bradshaw, also owned a business called Red Oak Hills, LLC (Red Oak Hills).  Star issued insurance policies to Red Oak Hills.  On March 30, 2008, Star and Sandstone amended a Star policy issued to Red Oak Hills (08 Star Policy).   The amendment added the Sandstone Hog Facilities as insured locations under the Livestock Care, Custody, and Control Coverage in the 08 Star Policy.  Indemnity Motion, Exhibits D-1, Policy Changes Endorsement No. 2.  The Livestock Care, Custody, and Control Coverage covered losses for injuries to covered animals. Id.

On December 21, 2008, Star issued another policy to Red Oak Hills (08-09 Star Policy).  Star Motion, Exhibit H, 08-09 Star Policy.

On August 2, 2009, Sandstone was named an additional insured generally on the Star 08-09 Policy.  08-09 Star Policy, Policy Change Endorsement No. 3.  Star issued a third policy on December 21, 2009 (09-10 Star Policy), which also listed Sandstone as an additional insured (collectively the Star Policies).  Star Motion, Exhibit I, 09-10 Star Policy.

The Indemnity Policies covered bodily injury and property damage from an occurrence:

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

(a)    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. . . .

. . . .

(b)    This insurance applies to "bodily injury" and "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" . . . .

(2)    The "bodily injury" or "property damage" occurs during the policy period; . . . .

E.g., 2016 Action Complaint, Exhibit 1, 08-09 Indemnity Policy issued to South (Example Indemnity Policy), Commercial General Liability Coverage Form, § I ¶¶1(a) and (b).

The Indemnity Policies contained exclusions for injuries that were expected or intended by the insured and for injuries from pollutants:

### 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .

. . . .

### f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. . . .

    (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

> > (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
> >
> > (i) Any insured; . . . .

Example Indemnity Policy, Commercial General Liability Coverage Form, § I ¶¶ 2(a), (b), and (f).

The Indemnity Policies defined "bodily injury," "property damage," "occurrence," and "pollutants" as follows:

**SECTION V – DEFINITIONS**

. . . .

3.      "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

13.      "Occurrence" means an accident, including continuous or repeated exposure to substantially the same harmful conditions.

. . . .

15.      "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste includes materials to be recycled, reconditioned or reclaimed.

. . . .

17.      "Property damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. . . .

b.  Loss of use of tangible property that is not physically injured. . . .

<u>Example Indemnity Policy</u>, <u>Commercial General Liability Coverage Form</u>, § V ¶¶ 3, 13, 15, 17.

The Indemnity Policies required Sandstone to notify Indemnity of an occurrence, claim, or suit as soon as practicable:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

. . . .

**2.  Duties in the Event of an Occurrence, Offense, Claim Or Suit**

a.  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. . . .

b.  If a claim is made or "suit" is brought against any insured, you must:
. . . .

(2)  Notify us as soon as practicable.

You must see to it that we receive notice of the claim or "suit" as soon as practicable.

<u>Example Indemnity Policy</u>, <u>Commercial General Liability Coverage</u> <u>Form</u>, § IV ¶¶ 2(a) and (b).  The comparable provisions of the Westfield and Star Policies were substantially similar.

The Indemnity Policies also contained an "Other Insurance" provision regarding the existence of other insurance coverage:

**4.  Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.    Primary Insurance**
This insurance is primary except when Paragraph **b**. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method of described in Paragraph **c**. below.

**b.    Excess Insurance**

**(1)** This insurance is excess over:

. . . .

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insurer's rights against all of those other insurers.

. . . .

### c.   Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

. . . .

Example Indemnity Policy, Commercial General Liability Coverage Form, § IV ¶¶ 4(a), (b), and (c).

The Star Policies Other Insurance provision stated, in part:

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

**b. Excess Insurance**

This insurance is excess over:

. . . .

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .

Westfield Motion, Exhibit 9, 08-09 Star Policy, Commercial General Liability Coverage Form, §IV ¶¶ 4(a) and (b).

The Star Policies also defined the coverage provided to an additional insured, such as Sandstone. The terms "you" and "your" in the Star Policies referred to Red Oak Hills:

Section II – Who Is an Additional Insured is amended to include as an additional insured [Sandstone], but only

with respect to liability for 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf;

A.     In the performance of your ongoing operations; or

B.     In connection with your premises owned by or rented by you.

Westfield Motion, Exhibit 9, 08-09 Star Policy, Additional Insured—Designated Person or Organization Endorsement.

On June 1, 2010, Sandstone's neighbors in Scott County (Neighbor Plaintiffs) filed the Underlying Action.  The Neighbor Plaintiffs in the Underlying Action alleged that the Sandstone Hog Facilities caused continuous harm beginning in 2007.  The Second Amended Complaint in the Underlying Action (Underlying Action Complaint) alleged that Sandstone negligently mismanaged the Hog Facilities by improperly handling manure and other hog waste products and by improperly disposing of dead hog carcasses.  The Underlying Action Complaint alleged that the Sandstone Hog Facilities emitted foul and offensive odors and toxic gases and fumes that harmed the Neighbor Plaintiffs.  The Underlying Action Complaint alleged that Sandstone also negligently subjected the Neighbor Plaintiffs and their properties to runoff of swine effluent,

chemicals, antibiotics, and other hazardous substances that came onto the neighboring properties. The Underlying Action Complaint alleged that Sandstone created additional hazards, including increased airborne dust by its overuse of the nearby roads. The Underlying Action Complaint alleged that Sandstone thereby interfered with the Neighbor Plaintiffs' businesses and their enjoyment of their homes and properties. Some Neighbor Plaintiffs alleged that Sandstone's activities caused them to abandon their homes. The Underlying Action Complaint sought damages for each Neighbor Plaintiff for the nuisance caused by Sandstone. See generally, 2016 Action Complaint, Exhibit B, Underlying Action Complaint.

Brian Bradshaw testified in his deposition in this case that the Neighbor Plaintiffs' attorneys in the Underlying Action had recently represented plaintiffs in a similar nuisance action in Missouri. He testified that the jury in the Missouri action awarded $12,000,000.00 to those plaintiffs. Star Motion, Exhibit B, Deposition of Brian Bradshaw (Bradshaw Deposition), at 94.

On August 6, 2010, Sandstone, Bradshaw, and Hollis Shafer sent General Liability Notice of Occurrence/Claim forms (singularly

"Notice of Claim" or collectively "Notices of Claim") to the Insurance

Companies.  <u>Indemnity Motion</u>, Exhibit F, <u>Notices of Claim</u>.   The

Notices of Claim notified the Insurance Companies of the

Underlying Action.  Sandstone attached copies of the original

Complaint in the Underlying Action to the Notices of Claim.  The

Notice of Claim to Indemnity referenced the Indemnity 08-09

Policies, but not the 09-10 Indemnity Policy then in effect.[1]

Westfield and Star agreed to defend Sandstone in the Underlying

Action under reservations of rights.  <u>Star Motion</u>, Exhibits J and K,

<u>Star and Westfield Reservations of Rights Letters</u>.

On August 31, 2010, Indemnity wrote a letter to Sandstone,

Bradshaw, and Shafer in response to the Notice of Claim.

Indemnity discussed the allegations in the Underlying Action and

the terms of the Indemnity 08-09 Policies.  Indemnity's

"Conclusion" portion of the letter stated, in part:

CONCLUSION

It is the position of . . . Indemnity Insurance
Company of North America, based upon the allegations
against each of you in the Complaint, that the policy
referenced herein may provide no coverage because of the

---

[1] By this time, only one of the 09-10 Indemnity Policies was in effect.  North and South had
merged with North as the surviving Sandstone entity, and Sandstone had cancelled the 09-10
Indemnity Policy issued to South.

applicability of the pollution exclusion to the claims set forth in the Complaint of the underlying plaintiffs.

For the reasons set forth herein, IINA will participate in the defense of each of you subject to this reservation of rights in conjunction with any of your other insurers. . . .

. . . .

We advise you that IINA intends to file a Complaint for Declaratory Judgment to have a court determine that IINA owes each of you no duty or obligation under the aforesaid policy of insurance for the claims of the underlying plaintiffs. We further advise each of you that in the event that we file such an action and in the event that IINA is successful with the Court declaring that there is no duty to defend under the policy, then IINA intends to seek reimbursement from you for the defense costs and expenses incurred on your behalf subject to this reservation of rights. . . .

Subject to this reservation of rights we will engage counsel to defend you, however, for us to do so, you must waive the conflict that such an attorney may have based on IINA's reservation of rights. . . . We enclose a Conflict Waiver Form, and if you sign it and return it to us promptly we will hire counsel for you.

If you choose not to waive the conflict as we have described it herein, you are free to engage counsel of your own selection to defend you in the Scott County, Illinois action, and we will reimburse you for the reasonable and necessary cost of such defense. We insist that any attorney you hire have the experience and expertise to handle such a case, and that he or she provide us with proof of the maintenance of professional liability insurance, and further that you and that attorney agree

> to respond to our requests for a status report when made.
>
> Again, you can waive the conflict as we described herein, and allow us to engage defense counsel for you subject to this reservation of rights. This is a decision which you should make at your very first opportunity.

Indemnity Motion, Exhibit I, Indemnity Reservation of Rights Letter.

On September 15, 2010, Indemnity filed a declaratory judgment action in this Court. Indemnity Motion, Exhibit J, Indemnity v. Sandstone South, LLC, et al., Case No. 10-3236 Complaint (Case No. 10-3236 d/e 1) (2010 Declaratory Action), C.D. Ill. Case No. 10-3236. Indemnity alleged that it had issued the 08-09 Policies to Sandstone. 2010 Declaratory Action, Complaint (Case No. 10-3236 d/e 1) (2010 Complaint), ¶ 16. Indemnity did not mention the 09-10 Indemnity Policies. Indemnity alleged that it had no duty to defend because Sandstone was not entitled to coverage:

> IINA contends that South, Brian, Eric and Hollis are not entitled to any coverage under the policy because of one or more or all of the following reasons:
>
> (a) The Complaint does not seek damages because of covered "bodily injury" as defined;
>
> (b) The Complaint does not seek damages because of covered "property damage" as defined;

(c)   The Complaint does not seek damages because of covered "personal and advertising injury" to which the policies apply;

(d)   The Complaint does not involve an "occurrence", that is, accidental conduct but only intentional and non-accidental conduct causing alleged damages and losses;

(e)   That if the Complaint alleges "bodily injury," "property damage," or "personal and advertising injury," then each and all of such claims are excluded by the pollution exclusion or one or more other exclusions in the policy.

2010 Complaint, ¶ 24.  Indemnity asked for a declaration that

Indemnity had no duty to defend the Underlying Action.  Id., at

11-14 Prayer for Relief.

On November 2, 2010, Sandstone's attorneys sent a letter to

Indemnity's counsel (November 2, 2010 Letter).  The body of the

November 2, 2010 Letter stated, in part:

On behalf of my clients, Brian Bradshaw, Hollis Shafer, Sandstone North, LLC, and Sandstone South, LLC ("Clients"), I am responding to correspondence sent by you regarding the above-mentioned insurance policies ("Policies") purchased through Indemnity Insurance Company of North America ("IINA").

As you are aware, the Clients have been named as defendants in *Marsh, et al. v. Bradshaw, et al.,* No. 2010 L 3 (Scott County) ("Underlying Case").  The original Complaint was filed in the Underlying Case on June 1,

2010, and [Indemnity] was provided prompt and timely notification of the claims against its insureds. . . .  [T]he Clients received correspondence from IINA, dated August 31, 2010, which offered to engage counsel for the Clients' defense in the Underlying Case but required them to waive any conflicts related to the representation before doing so.  The Clients have not . . . waived the conflict arising from representation by insurer-retained counsel in the Underlying Litigation.  On September 15, 2010, IINA filed a Complaint for Declaratory Judgment seeking a declaration that IINA has no duty to defend the Clients, as well as reimbursement of defense costs incurred on behalf of the Clients.

By this letter, Sandstone North, LLC; Sandstone South, LLC; Brian Bradshaw; and Hollis Shafer withdraw tender of their defense in the Underlying Case to IINA.  Although my Clients release IINA from its obligation to provide a defense under the Policies, they are not waiving any rights to indemnification under the Policies in relation to the Underlying Case.

The withdrawal of the Clients' tender of defense resolves all matters related to the Complaint for Declaratory Judgment, and we request that counsel for IINA in the declaratory judgment proceeding provide us with a proposed agreed motion for dismissal.

Indemnity Motion, Exhibit L, November 2, 2010 Letter.   In light of

the November 2, 2010 Letter, Indemnity moved to dismiss the 2010

Action without prejudice.  The Court allowed the motion and

dismissed Indemnity's 2010 Declaratory Action without prejudice.

2010 Declaratory Action, Order entered November 19, 2010 (Case

No. 10-3236 d/e 24). Thereafter, Westfield and Star agreed to share

the defense costs equally.  <u>Westfield Motion</u>, Exhibit J, <u>Declaration</u> <u>of Suzanne Karapashev</u>, ¶ 5; <u>Indemnity Motion</u>, Exhibit Q, <u>February</u> <u>21, 2011 Email from Ross Brocksmith, Westfield Insurance Claims</u> <u>Specialist, to Attorney Neher, counsel for Sandstone</u>.

Three years later, on December 10, 2013, Sandstone's counsel sent Indemnity's counsel another letter (December 10, 2013 Letter). The body of the December 10, 2013 Letter stated:

> [Indemnity] issued [08-09 Indemnity Policies] to Sandstone South, LLC, for the policy term 11/12/2008 – 11/12/2009.  In November 2010, our clients, Sandstone North, Sandstone South, Brian Bradshaw and Hollis Shafer, withdrew their tender of defense to IINA under these policies for the nuisance case, Alvin *Marsh, et al. v. Brian R. Bradshaw, et al.,* No. 2010-L-3 (Scott County). On November 19, 2010, the U.S. District Court for the Central District of Illinois dismissed the Complaint for Declaratory Judgment filed by IINA against our clients without prejudice.
>
> On November 13, 2013, the Fourth District Appellate Court issued its decision in *Country Mutual Insurance Company v. Hilltop View, LLC, et al.,* No. 4-13-0124, which rejected the argument that odor claims involving a hog production facility are "traditional environmental pollution" and excluded under the terms of an absolute pollution exclusion. The odor claims in the *Alvin Marsh* case are almost identical to the odor claims addressed by the Fourth District, and underlying plaintiffs in both cases are represented by the same counsel. A copy of the Fourth District's decision is attached.

In light of this decision, we are notifying you and your client, IINA, that the underlying case is scheduled for trial on January 6, 2014. I have enclosed a copy of the most recent Case Management Order. On December 11, 2013, our clients and their insurance carriers will participate in mediation with the underlying plaintiffs and the Honorable Patrick J. Hitpas. The mediation begins at 9:00 a.m. at our office in Springfield, Illinois.

Please let me know if you need more information regarding the *Alvin Marsh* case or the mediation.

2014 Declaratory Action, Amended Complaint, Exhibit 11,

December 10, 2013 Letter. Indemnity did not attend the December 11, 2013 mediation in the Underlying Action.

On December 17, 2013, Sandstone's counsel sent another letter to counsel for Indemnity (December 17, 2013 Letter). The body of the December 17, 2013 Letter stated, in part:

As you are aware, our clients, Sandstone North, LLC, and Hollis Shafer, are insureds under [08-09 Indemnity Policies]. Sandstone North, LLC, and Hollis Shafer ("Insureds") request that [Indemnity] agree to participate in the defense of its Insureds in *Alvin Marsh, et al. v. Brian R. Bradshaw, et al.,* No. 2010-L-3 (Scott County)("Underlying Suit").

. . . .

For the reasons set forth above, Insureds request that, within fourteen (14) days of receiving this letter, [Indemnity] respond and agree, in writing, to participate in the defense of the Insureds in the Underlying Suit. . . .

> We look forward to receiving [Indemnity's]
> commitment to participate in the defense of its Insureds
> in the Underlying Suit. Please feel free to contact me if
> you have any questions or need additional information.

2016 Declaratory Action, Complaint (d/e 1), Exhibit 15, December 17, 2013 Letter.

On January 30, 2014, Indemnity responded that it did not have any coverage obligation for the Underlying Action. See 2014 Declaratory Action, Amended Complaint, Exhibit 12, March 22, 2014 Letter from Sandstone's Counsel to Indemnity's Counsel (March 22, 2014 Letter). On February 4, 2014, Indemnity filed the 2014 Declaratory Action. Indemnity sought a declaration that it had no duty to defend the Underlying Action or to cover any losses that may arise in the Underlying Action. Indemnity alleged that Sandstone initially withdrew the tender of defense to Indemnity. Indemnity alleged that the December 17, 2013 Letter was an improper notice in violation of the 08-09 Indemnity Policy. Indemnity alleged that, in any event, the 08-09 Indemnity Policy was excess coverage and Star was obligated to provide primary coverage. See 2014 Declaratory Action, Amended Complaint, ¶¶ 17-19, 21-25.

On March 19, 2014, the State Court in the Underlying Action authorized the Underlying Action plaintiffs to seek damages against Sandstone for injuries that occurred up to and including November 15, 2013.  Westfield Motion, Exhibit C,  Underlying Action, Order entered March 19, 2014.

On March 22, 2014, Sandstone's counsel sent the March 22, 2014 Letter to Indemnity's counsel.  The body of the March 22, 2014 Letter stated:

> By e-mail dated December 10, 2013, I forwarded [Indemnity's counsel] a copy of the Second Amended Complaint in the above-captioned matter. By letter dated December 17, 2013, our firm advised [Indemnity] that the trial date in the above matter had been moved to March 24, 2014, and requested that IINA agree, in writing, to participate in the defense of its Insureds (Sandstone North, LLC, and Hollis Shafer) in the underlying suit under [remaining Indemnity Policies].  My December 17, 2013 correspondence did not specify a policy term.  IINA responded on January 30, 2014, and stated that there is no coverage under the above-referenced policies for the policy term of November 12, 2008, through November 12, 2009.  IINA filed a Complaint for Declaratory Judgment against the Insureds on February 4, 2014.
>
> On January 10, 2014, I sent the attached e-mail to [Indemnity's counsel] which forwarded the Motion to Supplement Pleadings filed by the underlying plaintiffs, and explained that Judge Cherry had granted plaintiffs' motion to supplement their complaint to extend the damages provision to November 15, 2013.  As you are aware, we have continued to keep [Indemnity's counsel]

apprised of developments and rulings in the underlying case. The case proceeds to trial on March 24, 2014.

In view of the Court's order extending the damages period, we are tendering the defense of Sandstone North, LLC, and Hollis Shafer under [Indemnity Policies] issued by IINA to Sandstone North, LLC, and Hollis Shafer for the 2009-2010, 2010-2011, 2011-2012, 2012-2013, and 2013-2014 policy periods. By this letter, we request that IINA agree, in writing, to participate in the defense of its Insureds in the underlying suit.

We look forward to receiving IINA's commitment to participate in the defense of its Insureds in the underlying suit. Please feel free to contact me . . . if you have any questions or need additional information.

2014 Declaratory Action, Amended Complaint, Exhibit 12, March 22, 2014 Letter.

On April 22, 2014, Indemnity moved to amend its Complaint to include all the Indemnity Policies. Motion for Leave to File Amended Complaint for Declaratory Judgment (Case No. 14-3040 d/e 33). The motion was allowed, and the Amended Complaint (Case No. 14-3040 d/e 34) was filed on April 24, 2014.

The Underlying Action went to trial on May 9, 2016. According to Bradshaw, the counsel for the Underlying Action plaintiffs stated in his closing argument that the jury should award his clients $7,500,000.00 in damages. Star Motion, Exhibit B,

Deposition of Brian Bradshaw, at 93-94.  On May 24, 2016, the jury rendered a verdict in favor of Sandstone and against the Neighbor Plaintiffs.  Westfield Motion, Exhibit D, Underlying Action, Jury Trial Docket Order.

On November 3, 2016, Westfield filed the 2016 Declaratory Action.  Westfield sought a declaratory judgment that Indemnity had a duty to defend the Underlying Action, and that Indemnity was obligated to reimburse Westfield all of the defense costs it paid, or in the alternative, was obligated to pay a pro rata share of defense costs.  See 2016 Declaratory Action, Complaint (Case No. 16-3298 d/e 1).

On February 6, 2018, Star filed a counterclaim against Indemnity.  2016 Declaratory Action, Star Insurance Company's Counterclaim for Declaratory Judgment and Monetary Relief (Case No. 16-3298 d/e 77) (Star Counterclaim).  Star asked for a declaration that Indemnity must reimburse Star for the costs paid to defend Sandstone, or in the alternative, Indemnity must pay its pro rata share of the defense costs.  Id.

On April 22, 2019, the State Court in the Underlying Action denied the Neighbor Plaintiffs' Motion for Judgment

Notwithstanding the Verdict, or in the Alternative, for a New Trial. <u>Star Motion</u>, Exhibit N, <u>Underlying Action</u>, <u>Order entered April 22, 2019</u>.  On May 15, 2019, the Neighbor Plaintiffs filed a Notice of Appeal.  <u>Westfield Motion</u>, Exhibit F, <u>Notice of Appeal (certificate of service dated May 15, 2019)</u>.

According to Westfield, it has paid at total of $1,290,443.44 in defense costs as of the date of the Westfield Motion.  <u>Westfield Motion</u>, <u>Statement of Undisputed Fact</u> ¶ 54.  According to Star, it has paid a total of $1,380,965.44 in Sandstone's defense costs in the Underlying Action as of the date of the Star Motion.  <u>Star Motion</u>, <u>Statement of Undisputed Fact</u> ¶ 48.  According to Indemnity, Westfield has paid $516,348.10 in defense costs prior to December 17, 2013, and $793,781.08 after December 17, 2013, for a total of $1,310,129.18 in defense costs, and Star had paid similar amounts in defense costs.  <u>Indemnity Motion</u>, <u>Statements of Undisputed Fact</u> ¶¶  45-47.

Westfield has submitted invoices and declarations from Sandstone's attorneys Edward W. Dwyer of the firm of Hodge Dwyer & Dwyer and Stephen R. Kauffmann of the firm of Hepler Broom attesting to the reasonableness of the fees.  <u>Westfield Motion</u>,

Exhibit K, Hodge Dwyer & Dwyer Invoices; Exhibit L, Hepler Broom Invoices; Exhibit M, Westfield Payment Ledgers; Exhibit N, Invoices for Expert Witnesses and Consultants; Exhibit O, Dwyer Declaration; and Exhibit P, Kaufmann Declaration. Star has also submitted invoices, affidavits, and declarations as to the amount of fees paid and the reasonableness of the fees. Star included an affidavit from Mark Zimmerman of the law firm of Clausen Miller, P.C., in addition to the fee information from the Hodge Dwyer & Dwyer and Hepler Broom law firms. Star Motion, Exhibit P, Affidavit of Nicholas J. Meinheit; Exhibit Q, Affidavit of Kara R. Hayes; Exhibits R and S, Affidavit of Edward W. Dwyer to authenticate billings, and accompanying invoices; Exhibit T, Affidavit of Stephen R. Kaufmann; and Exhibit T, Affidavit of Edward W. Dwyer regarding the reasonableness of the fees; Exhibit V, Affidavit of Mark W. Zimmerman. Indemnity has not provided any evidence controverting these attorneys' declarations.

As of the filing of the Motions, the Underlying Case remains pending on appeal.

<u>ANALYSIS</u>

The Insurance Companies have filed cross-motions for summary judgment. At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to the non-moving parties. Any doubt as to the existence of a genuine issue for trial must be resolved against the movant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). Once a movant has met its burden, the non-moving parties must present evidence to show that issues of fact remain with respect to an issue essential to the movant's case, and on which the movant will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

When read in this light, Sandstone sent the November 2, 2010 Letter to exercise its right under Illinois law to relieve one insurer of the obligation to defend a claim and have the other insurers provide the defense. The undisputed facts further show that Sandstone re-tendered the defense December 17, 2013 Letter in light of the

<u>Hilltop View</u> decision.  The undisputed facts show that the re-tender was reasonable under the circumstances.  Because the re-tender was reasonable, Indemnity is obligated to provide a defense to Sandstone along with Westfield and Star.

The Indemnity Policies stated that Indemnity would defend Sandstone in suits alleging covered claims.  Under Illinois law, insurance policies are contracts and are interpreted like other contracts.  <u>Westfield Ins. Co. v. Vandenburg</u>, 796 F.3d 773, 777 (7th Cir. 2015).  The Court must ascertain the intention of the parties from the text of the policy:

> Accordingly, our primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language.  If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy.
> Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation. Although "creative possibilities" may be suggested, only reasonable interpretations will be considered.  Thus, we will not strain to find an ambiguity where none exists.  Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous.

<u>Hobbs v. Hartford Ins. Co. of the Midwest</u>, 214 Ill.2d 11, 17, 823 N.E.2d 561, 564 (Ill. 2005) (internal citations omitted).

An insurer's contractual duty to defend is broader than its duty to indemnify. An insurer must defend if the allegations in the lawsuit filed against the insured, if true, could possibly constitute a loss covered by the insurance policy. To determine whether the insurer had a duty to defend, the Court compares the allegations in the underlying complaint with the coverage provided in the insurance policy. "If any of facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 108, 607 N.E.2d 1204, 1212 (Ill. 1992).

In this case, the Underlying Action Complaint alleged, among other things, that negligent mismanagement of the Sandstone Hog Facilities caused the emission of offensive odors that injured the Plaintiff Neighbors. The allegation that improper management of operations caused the offensive odors could constitute an occurrence and the offensive odors could subject the neighbors to bodily injury. See e.g., County Mut. Ins. Co. v. Bible Pork, Inc., 2015 IL App (5th) 140211 ¶¶ 31-33, 42 N.E.3d 958, 958 (Ill. App. 5th Dist. 2015).

The Pollution Exclusion would not apply to exclude the injury from the offensive odors from coverage. The Illinois Supreme Court determined that pollution exclusions in commercial general liability policies such as the Indemnity Policies only apply to "traditional environmental pollution." American States Ins. Co. v. Koloms, 177 Ill.3d 473, 494, 687 N.E.2d 72, 82 (Ill. 1997). Further, the Illinois Fourth District Appellate Court determined that offensive odors from a Hog Facility are not a traditional type of pollution, and so, injuries from such odors are not excluded from coverage. Country Mutual Ins. Co. v. Hilltop View, LLC, 2013 IL App (4th) 130124 ¶¶ 28-42, 998 N.E.2d 950, 957-59 (Ill. App. 4th Dist. 2013). This Court has carefully considered the Koloms and the Hilltop View decisions and concludes that the Illinois Supreme Court would agree with the Hilltop View decision that odors, in and of themselves, are not traditional types of pollution. The Underlying Action Complaint alleged injuries due to odors. The Underlying Action Complaint, therefore, alleged bodily injuries that could have been covered by the Indemnity Policies and are not excluded by the Pollution Exclusion.

The Other Insurance provision of the Indemnity Policies did not bar the possibility of covered losses under the allegations of the Underlying Action Complaint. The Underlying Action Complaint alleged that Sandstone's wrongful conduct began in 2007 and continued thereafter. The 08-09 Indemnity Policies were the only commercial general liability policies in effect from November 12, 2008 until August 2, 2009 when Sandstone was made an additional insured in the Star Policies. As such, Indemnity provided exclusive commercial general liability coverage for losses during that period. The allegations in the Underlying Action Complaint, if true, could have established losses from November 12, 2008 until August 2, 2009, for which Indemnity was the only insurer. The possibility of such covered losses gave Indemnity a duty to defend if Sandstone complied with the notice provisions in the Indemnity Policies.

Indemnity argues that the Indemnity Policies' Other Insurance provisions made the Indemnity Policies excess insurance because Sandstone was an added insured since March 30, 2008 on Star Policies. As excess coverage, Indemnity argues that it did not have a duty to defend the Underlying Action and did not have a duty to cover losses until the primary coverage under the Star Policies was

exhausted. Indemnity is incorrect. The Indemnity Policies' Other Insurance provisions only made Indemnity's coverage excess if other insurance provided primary coverage for the loss and also named Sandstone as an additional insured. The March 30, 2008 change to the 08 Star Policy added the Sandstone Hog Facilities as insured locations on March 30, 2008 under the Livestock Care, Custody, and Control Coverage. That coverage only covered injuries to covered animals damaged on the covered premises. The Livestock Care, Custody, and Control Coverage did not provide Sandstone with coverage for the neighbors' nuisance claims in the Underlying Action, and so, did not trigger the Other Insurance provisions of the Indemnity Policies. The August 2, 2009 change to the Star policies added Sandstone as an additional insured for all purposes. Indemnity had exclusive primary coverage from November 12, 2008 to August 2, 2009.

In addition, Underlying Action Complaint alleged claims that could have imposed primary coverage obligations on Indemnity after August 2, 2009. The Indemnity Policies' Other Insurance provisions only made Indemnity's coverage excess if other insurance provided coverage for the loss and named Sandstone as an

additional insured.  The Star Policies only provided coverage for a loss that was due to the actions of Red Oak Hills or someone acting on its behalf.  The allegations in the Underlying Action Complaint, if true, could have established losses from actions committed by Sandstone only, and not by Red Oaks Hills or those acting on its behalf.  If so, the Star Policies would have provided no coverage to Sandstone as an additional insured.  In that event, the Indemnity Policies' Other Insurance provisions would not have applied and the Indemnity Policies would have had primary coverage.  Because the Underlying Action Complaint alleged all these possibilities of covered losses, Indemnity had a duty to defend Sandstone if Sandstone complied with the notice provisions in the Indemnity Policies.

Indemnity argues in reply that Star forfeited any argument that Indemnity could have had primary coverage for alleged losses in the Underlying Action because Star alleged in its Counterclaim that it paid for defense costs because it was contractually obligated to do so.  Indemnity Insurance Company of North America's Combined Reply in Support of Its Motion for Summary Judgment (Case No. 16-3298 d/e 104, Case No. 14-3040 d/e 115), at 5-8

(citing Star Counterclaim ¶¶ 45-46). Arguments raised for the first time in reply are forfeited. E.g., Narducci v. Moore, 572 F.3d 313, 324 (7th Cir. 2009). Indemnity, therefore, has forfeited this argument. Regardless, Indemnity is incorrect. The duty to defend is broader than the duty to cover losses. As discussed above, the allegations in the Underlying Action Complaint, if proven, could have possibly established primary coverage under either the Star Policies, the Indemnity Policies, or both. Because of these possibilities, Star and Indemnity Policies both had a duty to defend, depending on whether Sandstone complied with the notice provisions of the Indemnity and Star Policies. Star's allegation that it had a contractual duty to defend did not preclude the possibility that Indemnity also had a duty to defend.

In this case, Sandstone gave proper notice on August 6, 2010 by sending the Notices of Claim, but then withdrew the tender of the defense of the Underlying Action from Indemnity by sending the November 2, 2010 Letter. Sandstone's withdrawal of tender of the defense "deactivated" or relieved Indemnity of any obligation to defend Sandstone in the Underlying Action. When, as here, multiple insurance companies have a duty to defend an insured in

a single action, Illinois law provides that the insured can decide which insurer or insurers should provide the defense.  <u>Kajima Const. Services, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 227 Ill.2d 102, 107-08,  879 N.E.2d 305, 309-10 (Ill. 2007); <u>John Burns Const. Co. v. Indiana Ins. Co.</u>, 189 Ill.2d 570, 575-77, 727 N.E.2d 211, 215-16 (Ill. 2000); <u>Cincinnati Companies v. West American Ins. Co.</u>, 183 Ill.2d 317, 326, 701 N.E.2d 499, 503-04 (Ill. 1998).  If an insured decides to relieve an insurer of its obligation to participate in the defense, then the relieved insurer does not have to pay for the defense of the action.  In addition, the other insurers cannot seek reimbursement from the insurer relieved of the duty to defend.  <u>John Burns Const.</u>, 189 Ill.2d at 575, 727 N.E.2d at 215. This principle of Illinois insurance law is referred to as the "targeted tender" doctrine.  <u>See</u> <u>Kajima</u>, 227 Ill.2d at 107, 879 N.E.2d at 309.

Westfield and Star argue that the targeted tender doctrine does not apply in this case because the various Policies did not cover the same time periods.  The Illinois Supreme Court cases that addressed the targeted tender doctrine all involved multiple insurance policies that concurrently covered the same time period. The alleged injury in those cases occurred within the effective time

period of the multiple policies.  See e.g., Kajima, 227 Ill.2d at 104-05, 879 N.E.2d at 307-08 (multiple policies covered an injury to a worker at a construction site).  The Underlying Action alleged Sandstone mismanaged its Hog Facilities for years and caused continuing injuries from 2007 to 2013.  The Insurance Companies' Policies covered different periods within that six-year period.  The Westfield Policies, in particular, were the only general commercial liability policies in effect from April 24, 2007 to November 12, 2008.  Westfield and Star argue that the targeted tender doctrine does not apply in this circumstance.

The Illinois Appellate Courts have split on whether the targeted tender doctrine applies to situations in which the insurance policies in question did not provide temporally overlapping coverage.  In Richard Marker Associates v. Pekin Ins. Co., 318 Ill.App.3d 1137, 743 N.E.2d 1078 (Ill. App. 3d Dist. 2001), the Defendant Pekin Insurance's policy covered the plaintiff from August 25, 1991 to August 25, 1992, and Statewide Insurance covered the plaintiff after August 25, 1992.  The alleged injury was potentially covered by both policies.  Both insurers refused to defend.  The plaintiff ultimately relieved Statewide of the obligation

to defend and sued Pekin to pay for the defense. The Appellate Court for the Third District held that the targeted tender doctrine applied and ordered Pekin to pay the defense costs. Id., 318 Ill.App.3d at 1142-44, 743 N.E.2 at 1082-83.

In Illinois School District Agency v. St. Charles Unit School District, 2012 IL App (1st) 100088 ¶¶ 36-43, 971 N.E.2d 1099, 1108-12 (1st Dist. 2012), the Illinois First District Appellate Court held that the targeted tender doctrine did not apply when insurance policies did not concurrently cover the same time period. The Illinois Supreme Court has not resolved this conflict.

In this diversity case, this Court must decide how the Illinois Supreme Court would decide this issue. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 635 (7th Cir. 2002). The Illinois Supreme Court recognized the targeted tender doctrine when the Court determined that an insurer's duty to defend is triggered when it receives actual notice of the alleged facts that give rise to the claim, even if the insured has not given any notice of the claim. Cincinnati Companies, 183 Ill.2d at 326-27, 701 N.E.2d at 503-04. This actual notice rule ensures that an insured who has paid premiums is not left with no means to defend against a claim. The

actual notice trigger for the duty to defend puts the onus on the insurer to contact the insured and inquire whether the insured wants the insurer to defend.  Cincinnati Companies, 183 Ill.2d at 328-29, 701 N.E.2d at 504-05.

The Illinois Supreme Court recognized in Cincinnati Companies that sometimes an insurer may have a duty to defend but the insured does not want a particular insurer to provide a defense.  See Id.  An insured may have many reasons for wanting a particular insurer involved in a case.  For example, a general contractor may want a subcontractor's insurance to defend a claim that arose because of the subcontractor's actions, and the general contractor may not want its insurer involved.  See e.g., Burns Const. Co., 189 Ill.2d at 571-72, 727 N.E.2d at 213-14 (General contractor directed subcontractor's insurance to pay for claim arising from subcontractor's alleged defective workmanship).  Moreover, insureds may want to defend without an insurer's involvement because the insured does not want to pay increased premiums that may result.  Ultimately, the Illinois Supreme Court approved the targeted tender doctrine to protect the insured by

giving the insured the flexibility to pick and choose which insurer

must defend when multiple insurers have a duty to defend:

> In *Cincinnati Cos. v. West American Insurance Co.,* 183
> Ill.2d 317, 233 Ill.Dec. 649, 701 N.E.2d 499 (1998), this
> court considered what is necessary to trigger an insurer's
> duty to defend, and held that the duty arises with actual
> notice of a claim against an insured, regardless of the
> insured's level of sophistication. In reaching that result,
> the court acknowledged the line of authority that granted
> an insured the right to elect which of its insurers will
> defend a particular case. The court stated:
>
>> "Where an insured makes such a designation, the
>> duty to defend falls solely on the selected insurer.
>> That insurer may not in turn seek equitable
>> contribution from the other insurers who were not
>> designated by the insured. [Citation.] This rule is
>> intended to protect the insured's right to knowingly
>> forgo an insurer's involvement.
>> [Citation.]" *Cincinnati Cos.,* 183 Ill.2d at 324, 233
>> Ill.Dec. 649, 701 N.E.2d 499.
>
> The court thus concluded that "an insured may
> knowingly forgo the insurer's assistance by instructing
> the insurer not to involve itself in the litigation. The
> insurer would then be relieved of its obligation to the
> insured with regard to that claim." *Cincinnati Cos.,* 183
> Ill.2d at 326, 233 Ill.Dec. 649, 701 N.E.2d 499.

John Burns Const. Co., 189 Ill. 2d at 574–75, 727 N.E.2d at 215.

The Court concludes that the Illinois Supreme Court would

apply the protections of the targeted tender doctrine to Sandstone

in this case. The Illinois Supreme Court decisions focus on

protecting the insured's right to decide which insurer should defend a claim.  The Court concludes that the Illinois Supreme Court would protect Sandstone as much as any other insured, and so, would allow Sandstone to decide which insurer would defend the Underlying Action.

The Illinois School decision, in which the Appellate Court held that the targeted tender doctrine only applied if the insurance policies concurrently covered the same period, relied on the Illinois Supreme Court's Kajima decision. The Kajima decision addressed the impact of the targeted tender doctrine on the duty of multiple insurers to indemnify an insured for a single covered loss when some insurers agreed to provide primary coverage (primary insurers) and some agreed to provide excess coverage (excess insurers).  The Kajima Court held that primary insurers which defended the case paid first to their limits; primary insurers that the insured instructed not to provide a defense under the targeted tender doctrine paid second up to their limits; and excess insurers paid last after all primary coverage was exhausted.  Kajima, 227 Ill.2d at 117, 879 N.E.2d at 314.  The Illinois Supreme Court in Kajima referred to insurers that provided "concurrent primary

coverage" because the insurers had a concurrent contractual duty to provide primary coverage for a single loss. The Appellate Court in Illinois School concluded that the reference to concurrent primary coverage in Kajima limited the targeted tender doctrine to cases in which the policies concurrently covered the same time period. Illinois School, 2012 IL App (1st) ¶¶ 39-43, 971 N.E.2d at 1109-12.

This Court concludes that the Kajima decision reference to "concurrent primary coverage" did not limit the targeted tender doctrine to policies that covered the same time period. The Kajima decision resolved the coverage issue of the order of payment between primary insurers and excess insurers under the targeted tender doctrine. The Illinois Supreme Court referred to "concurrent primary coverage" because the targeted tender doctrine would only affect coverage issues when multiple insurers have concurrent obligations to cover the same loss. The Kajima decision did not address the duty to defend.

Many insurers may have concurrent duties to defend a single suit even if the potential loss that may be covered by each policy is different. As discussed above, the Illinois Supreme Court has

stated that the targeted tender doctrine protects the right of the insured to decide which insurer should provide that defense. Burns Const. Co., 189 Ill. 2d at 574–75, 727 N.E.2d at 215. The Illinois Supreme Court in Kajima agreed with the Cincinnati Companies and Burns Const. Co. decisions. See Kajima, 227 Ill.2d at 107, 879 N.E.2d at 309 (The targeted tender doctrine "allows an insured covered by multiple insurance policies to select or target which insurer will defend and indemnify it with regard to a specific claim."). In this case, the Insurance Companies had a concurrent duty to defend Sandstone in a single suit, the Underlying Action. As a result, the Court concludes that the Illinois Supreme Court would hold that the targeted tender doctrine applied, and Sandstone could elect to relieve Indemnity from providing a defense.

The Appellate Court in Illinois School also recognized that few other States apply the targeted tender doctrine and some courts have criticized the doctrine. See Illinois School, 2012 IL App (1st) 100088 ¶ 37, 971 N.E.2d at 1109. The targeted tender doctrine is a distinct minority rule. Only Washington and Montana appear to have recognized a "selective tender" rule that is similar to the Illinois rule. See Mutual of Enumclaw Ins. Co. v. USF Ins. Co., 164

Wash.2d 411, 191 P.3d 866, 873 (Wash. 2008); <u>Casualty Indem. Exchange Ins. Co. v. Liberty Nat Fire Ins. Co.</u>, 902 F.Supp. 1235, 1237, 1238 & n. 3 (D. Mont. 1995). This Court did not find any other State that recognized a similar doctrine. Even so, this Court must follow Illinois law as it is established by the Illinois Supreme Court regardless of whether Illinois follows a majority or minority rule among the several States. <u>See</u> <u>Allstate Ins. Co.</u>, 285 F.3d at 635. The Illinois Supreme Court adopted the targeted tender rule to ensure that the insured had the right to choose which insurer would pay for a defense. <u>Burns Const. Co.</u>, 189 Ill. 2d at 574–75, 727 N.E.2d at 215. The Court concludes the Illinois Supreme Court would apply that rule here. The Insurance Companies had a duty to defend on actual notice of Sandstone's claims, but Sandstone retained the right to relieve an insurer from its duty to defend for whatever reason. The Court agrees with the <u>Richard Marker Associates</u> decision and declines to follow the <u>Illinois School</u> decision. Sandstone relieved Indemnity of its duty to defend the Underlying Action in the November 2, 2010 Letter. Indemnity had no further obligation to defend the Underlying Action at that point.

Westfield and Star argue that Sandstone only withdrew the tender of the defense under the 08-09 Indemnity Policy but did not withdraw Indemnity's obligation to defend under the remaining Indemnity Policies. The Court disagrees. The November 2, 2010 Letter stated, "By this letter, Sandstone North, LLC; Sandstone South, LLC; Brian Bradshaw; and Hollis Shafer withdraw tender of their defense in the Underlying Case to IINA." Sandstone withdrew the defense of the Underlying Action from Indemnity. The language of the November 2, 2010 Letter is clear. After receipt of the November 2, 2010 Letter, Indemnity could not have interjected itself into Sandstone's defense. The Court finds that Illinois protected Sandstone's right to decide whether an insurer should participate in a defense. John Burns Const., 189 Ill.2d at 575, 727 N.E.2d at 215. The undisputed facts establish that, on November 2, 2010, Sandstone relieved Indemnity of its duty to defend the Underlying Action.

On December 17, 2013, Sandstone re-tendered the defense of the Underlying Action to Indemnity. Indemnity argues that once an insured relieves an insurer from the duty to defend, the insurer is

completely and permanently released from the duty to defend. Indemnity cites no authority for that proposition.

Star, however, argues that the <u>Burns Const. Co.</u> case approved a re-tender. In <u>Burns Const. Co.</u>, the insured Burns Const. Co. (Burns) had coverage under policies issued by Defendant Indiana Insurance Co. (Indiana) and Royal Insurance Company (Royal). Burns initially told Indiana and Royal that Burns wanted Indiana only to provide a defense to the underlying action and did not want Royal to be involved. A month later, Indiana refused to provide a defense. Burns then went back to Royal and re-tendered it the defense. <u>Burns Const. Co.</u>, 727 N.E.2d at 213-14. Royal accepted the defense. The Illinois Supreme Court did not address whether Burns had the right to re-tender the defense or whether Royal had to agree to defend at that time. The validity of the re-tender was not at issue in that case.

The Court has not found an Illinois case addressing whether an insured may re-tender a defense after withdrawing a defense, and the parties have not cited a case on the question. The Court also has not found a case in other jurisdictions that addresses the validity of a re-tender after an insured has relieved an insurer from

providing a defense. The cases found from other States that recognize a similar selective tender doctrine, Washington and Montana, only addressed the effect of an insured deciding not to tender a defense to a particular insurer. See Mutual of Enumclaw Ins. Co., 164 Wash.2d at 421, 191 P.3d at 873; Casualty Indem. Exchange Ins. Co., 902 F.Supp. at 1239 n. 4. The cases did not address situations in which an insured withdraws a tender and then re-tenders. The question of whether the insured can re-tender a defense after relieving an insured of the duty to defend appears to be one of first impression.

This Court must determine how the Illinois Supreme Court would decide the question of whether the insured can re-tender a defense after relieving an insured of the duty to defend.[2] As discussed above, the Illinois Supreme Court has emphasized protecting the insured's rights. Ambiguities in insurance contracts are read in favor of the insured. An insurer's duty to defend in Illinois is triggered if the insurer has actual notice of the claim even before an insured gives any notice. The insured in Illinois retains

---

[2] This Court also may not certify the question to the Illinois Supreme Court. Only the Court of Appeals may certify a question to the Illinois Supreme Court. Ill. Sup. Ct. Rule 20; 7th Cir. R. 52.

the right to choose which insurer should pay for a defense. The Illinois cases emphasize the right of an insured that had paid premiums to receive a defense and to control that defense. In light of these principles, the Court concludes that the Illinois Supreme Court would decide that an insured should be able to change its position and re-tender a defense to an insurer if the re-tender is reasonable under the circumstances.

The Burns Const. Co. case gives a good example of why Illinois would recognize an insured's right to change positions and re-tender. Burns told Indiana to defend and relieved Royal of the duty to defend. According to Indemnity, Royal was completely and permanently relieved of any obligation to defend Burns. A month later, Indiana refused to defend. According to Indemnity, Burns would be left with no defense. Burns' only recourse would be to pay for the defense out-of-pocket and sue Indiana for reimbursement. The Court is convinced that the Illinois Supreme Court would have rejected such an outcome. The Illinois Supreme Court would not have left Burns without a defense, particularly since Burns promptly re-tendered the defense to Royal only a month after withdrawing the defense. The Court is convinced that the Illinois

Supreme Court would allow an insured to re-tender a defense to an insurer at least under some circumstances.

The question then becomes when is a re-tender appropriate. The Court concludes that the reasonableness of the re-tender should generally be governed by Illinois law regarding the notice requirements under an insurance contract. The situation of an insurer relieved of the duty to defend is comparable to an insurer that does not have actual notice of a claim and receives a notice of claim from an insured. In both of these situations the insurer would have no basis to know that they should investigate the claim or participate in its defense.[3] Because the insurer which receives a re-tender is in a similar situation to an insurer with no actual notice which receives a notice of a claim, Illinois law on the validity of the notice should provide guidance in determining the reasonableness of a re-tender.

Illinois law generally requires an insured to give an insurer notice of a claim within a reasonable amount of time under the

_____

[3] The comparability of the two situations is limited to the duty to defend. The Kajima case establishes that a primary insurer relieved of the duty to defend would still have an obligation to pay a covered loss after the other primary insurers exhausted their coverage limits. Kajima, 227 Ill.2d at 117, 879 N.E.2 at 314. The insurer with no notice may, under appropriate circumstances, have no duty to indemnify as well as no duty to defend. See State Auto Property and Casualty Ins. Co. v. Brumit Services, Inc., 877 F.3d 355, 357 (7th Cir. 2017).

circumstances.  <u>West American Ins. Co. v. Yorkville Nat. Bank</u>, 238 Ill.2d 177, 185, 939 N.E.2d 288, 293 (Ill. 2010).  Illinois Courts look to five factors to determine whether the insured gave notice within a reasonable time, "(1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer."  <u>Id.</u>  The reasonableness of the timing of the notice is an issue of fact.  <u>Id.</u>  The issue may be decided at summary judgment, however, if the facts are undisputed.  <u>See</u> <u>State Auto Property and Casualty Ins. Co. v. Brumit Services, Inc.</u>, 877 F.3d 355, 357 (7th Cir. 2017) ("Our job is to apply Illinois law to the undisputed facts of the case.").

The specific language of the policy's notice provision does not aid in the reasonableness analysis in this case because the Indemnity Policies did not provide a specific time frame for

providing notice.  <u>West American Ins. Co. v. Yorkville Nat. Bank</u>,

238 Ill.2d at 186, 939 N.E.2d at 293.[4]

Sandstone's sophistication in commerce and insurance

matters and its awareness of an event that may trigger insurance

coverage tend slightly to show that the re-tender was reasonable

under the circumstances.  Sandstone's principle owner Bradshaw

was an experienced businessman and competent counsel

represented Sandstone, attorneys Edward W. Dwyer and Stephen R.

Kaufmann.  Sandstone was well-aware of the contractual notice

requirement.  Sandstone sent the Notices of Claim on August 6,

2010 to comply with this requirement.  Sandstone knew the Notice

of Claim would trigger Indemnity's duty to defend.

Sandstone also responded reasonably in light of Indemnity's

August 31, 2010 Letter and 2010 Declaratory Action.  Indemnity

asserted that it had no duty to cover losses from the Underlying

Action under the Pollution Exclusion in the Indemnity Policies.

The effect of pollution exclusion provisions in commercial general

liability policies on coverage of nuisance suits involving Hog

---

[4] The specific language of the policy may rarely assist in determining whether a re-tender was reasonable under the circumstances because the notice provisions of insurance policies do not currently address re-tender.

Facilities was unclear in 2010.  Sandstone may have had a good legal argument that Indemnity had a duty to defend, but the outcome of the 2010 Declaratory Action was not certain.  Sandstone made a strategic decision to withdraw the tender to Indemnity to avoid the cost of litigating the 2010 Declaratory Action. Sandstone's actions were reasonable in light of the uncertainty in the law and Indemnity's resistance to providing a defense.

The fourth factor, the insured's diligence in ascertaining whether policy coverage is available, weighs in favor of finding that Sandstone's re-tender was reasonable under the circumstances. The <u>Hilltop View</u> case changed the relevant circumstances.  The <u>Hilltop View</u> decision held that the pollution exclusion would not exclude coverage for injuries from noxious or offensive odors from Hog Facilities.  The <u>Hilltop View</u> decision established that, contrary to Indemnity's stated position, coverage could be available under the Indemnity Policies.  Sandstone acted quickly on that changed circumstance.  Sandstone sent the December 10, 2013 Letter and the December 17, 2013 Letter just a few weeks after the <u>Hilltop View</u> decision.  Sandstone's prompt action also showed diligence

and weighs in favor of finding the re-tender was reasonable under the circumstances.

The fifth factor of prejudice to the insurer from the delay is not significant in this case because the undisputed evidence fails to show no material prejudice to Indemnity. Sandstone provided prompt notice initially on August 6, 2010. Indemnity incorrectly disputed its duty to defend Sandstone in the August 31, 2010 Letter and the 2010 Declaratory Action. Once the Hilltop View Court clearly established that the Indemnity was wrong about the applicability of the Pollution Exclusion to the Underlying Action, Sandstone promptly re-tendered the defense. Indemnity had a duty to defend Sandstone from receipt of the August 6, 2010 Notice. Any prejudice or injury to Indemnity arose from its erroneous assertion of the Pollution Exclusion, not from any dilatory actions by Sandstone.

The Court also sees no material prejudice to Indemnity by the re-tender on December 17, 2013. Delayed notices may prejudice an insurer by denying the insurer the opportunity to investigate claims and prepare defenses to limit losses. See Fairmont Park, Inc. v. Travelers Indemnity Company, 982 F.Supp.2d 864, 870 (S.D. Ill.

2013) (and cases cited therein); <u>American Nat. Fire Ins. Co. v.</u>

<u>National Union Fire Ins. of Pittsburgh, PA</u>, 343 Ill.App.3d 93, 105,

796 N.E.2d 1133, 1143 (Ill. App. 1st Dist. 2003).  In this case,

Indemnity did not suffer any prejudice from losing a chance to

investigate or participate in the defense because Sandstone

prevailed at trial.  Sandstone's attorneys provided full and complete

defense to the Underlying Action.  Indemnity could not have

obtained a better result even if it participated throughout the

litigation.[5]

Indemnity also suffered no prejudice being unable to control

the cost of Sandstone's defense prior to the December 17, 2013 re-

tender.  Westfield and Star paid approximately $2,600,000.00 to

defend the Underlying Action.  Westfield and Star have presented

evidence that the fees were reasonable.  The fact that Westfield and

Star paid the fees supports the inference that the fees were

reasonable.  <u>See</u> <u>Cintas Corp. v. Perry</u> 517 F.3d 459, 469 (7th Cir.

---

[5] The Underlying Action remains on appeal, but Indemnity correctly points out that the appeal only "creates a speculative and theoretical risk of reversal on appeal."  <u>Indemnity Motion</u>, at 23. Such speculation is not sufficient to raise an issue of fact at summary judgment.  <u>See</u> <u>e.g.</u>, <u>Springer v. Durflinger</u>, 518 F.3d 479, 484 (7th Cir. 2008) ("[S]peculation many not be used to manufacture a genuine issue of fact" at summary judgment.) (quoting <u>Amadio v. Ford, Motor Co.</u>, 238 F3d 919, 927 (7th Cir. 2001)).

2008) ("[T]he best evidence of whether attorney's fees are reasonable is whether a party has paid them."). In addition, the Neighbor Plaintiffs asked for $7,500,000.00 at trial. Plaintiffs in a similar case in Missouri secured a $12,000,000.00 verdict. Indemnity presents no evidence disputing the reasonableness of the defense costs. Given the risks involved and the evidence presented regarding the fees, the approximately $2,600,000 in defense costs was reasonable. See <u>Medcom Holding Co. v. Baxter Travenol Labs., Inc.</u>, 200 F.3d 518, 521 (7th Cir. 1999) (District Courts should undertake "an overview of MHC's aggregate costs to ensure that they were reasonable in relation to the stakes of the case."). Indemnity, therefore, would have paid a similar amount if it had participated in the defense from the beginning.

Weighing all these factors in light of the undisputed facts, the Court finds that Sandstone's December 17, 2013 re-tender was reasonable under the circumstances. In 2010, Indemnity erroneously asserted both in the August 31, 2010 Letter and the 2010 Declaratory Action that the Pollution Exclusion in the Indemnity Policies relieved it of any obligation to defend the Underlying Action. Sandstone made a strategic decision to

withdraw the tender to Indemnity of the defense of the Underlying Action to avoid litigating the 2010 Declaratory Action. On December 17, 2013, Sandstone promptly re-tendered the defense to Indemnity after the <u>Hilltop View</u> decision clearly established that the Pollution Exclusion did not relieve Indemnity of its obligation to defend the Underlying Action. The three-year delay did not prejudice Indemnity because Sandstone prevailed at trial and because the defense costs Sandstone incurred were reasonable. Indemnity would have incurred a similar amount to defend the Underlying Action and Indemnity could not have secured a better result than a defense verdict and no damages. The December 17, 2013 re-tender, therefore, was reasonable under the circumstances.

Indemnity must pay a pro rata share of the defense costs for the Underlying Action under the Illinois doctrine of equitable contribution. To establish a claim for equitable contribution Westfield and Star must show (1) all facts necessary to show that Sandstone is entitled to recover defense costs from Indemnity; (2) the reasonableness of the amounts that Westfield and Star paid to cover Sandstone's defense costs; and (3) an identity between the Westfield and Star policies and the Indemnity Policies as to parties

and insurable interests and risks. See Schal Bovis, Inc. v. Casualty Ins. Co., 315 Ill.App.3d 353, 362, 732 N.E.2d 1179, 1186 (Ill. App. 1st Dist. 2000); Acuity Ins. Co. v. 950 W. Huron Condo. Ass'n, 2019 IL App (1st) 180743, ¶ 47, 2019 WL 1416820 at *7 (Ill. App. 1st Dist. 2019).

All these elements have been established. Indemnity had a duty to defend Sandstone in the Underlying Action, the fees and costs incurred by Sandstone in its defense were reasonable, and all the Insurance Companies all insured Sandstone for the same risks of bodily harm and property damages from occurrences alleged in the Underlying Action pursuant to substantially similar commercial general liability coverage. Westfield and Star are entitled to recover a pro rata share of the defense costs from Indemnity.

Westfield and Star argue that Indemnity is obligated to pay all the defense costs for the Underlying Action because Indemnity waived its right to assert any contract defense to its duty to defend. Generally, an insurer that has notice of a claim or suit against an insured has four options: (1) provide a defense; (2) provide a defense under a reservation of rights; (3) file a declaratory judgment action to ask the court to declare its obligations; or (4) do nothing and

thereby refuse to defend. If the insurer elected the last option, then it waived all policy defenses to coverage. <u>See</u> <u>Title Industry Assurance Co., R.R.G. V. First American Title Insurance Company</u>, 853 F.3d 876, 883 (7th Cir. 2017). Westfield and Star argue that Indemnity chose the fourth option for the 09-10 Indemnity Policies. Westfield and Star note that the 2010 Action only alleged that Indemnity issued the 08-09 Indemnity Policies but did not mention the 09-10 Indemnity Policies in effect at the time. They argue that Sandstone's November 2, 2010 Letter only referenced the 08-09 Indemnity Policies, and so, only relieved Indemnity of the obligation to defend under 08-09 Indemnity Policies and not the 09-10 Indemnity Policies. They argue that Indemnity waited over three years, until April 22, 2014, to move to amend the 2014 Action to bring a declaratory judgment action with respect to the 09-10 Indemnity Policies (as well as the 10-11 Indemnity Policy, the 11-12 Indemnity Policy, and the 12-13 Indemnity Policy). They argue that this amendment came too late. They argue that Indemnity thereby waived any contract defenses to its duty to defend Sandstone in the Underlying Action, including its defense based on Sandstone's compliance with the notice provisions of the Indemnity Policies.

The Court disagrees. Indemnity promptly notified Sandstone in the August 31, 2010 Letter that it would provide a defense under a reservation of rights and would file a declaratory judgment action. Indemnity did not choose the fourth option of doing nothing.

Once Indemnity filed the 2010 Declaratory Action, Sandstone exercised its right as an insured to choose which insurer would defend it. True, Sandstone only referenced the 08-09 Policies in the November 2, 2010 Letter, but Sandstone clearly stated in the November 2, 2010 Letter that it elected not to have Indemnity participate in its defense, "By this letter, Sandstone North, LLC; Sandstone South, LLC; Brian Bradshaw; and Hollis Shafer withdraw tender of their defense in the Underlying Case to IINA." Indemnity Motion, Exhibit L, November 2, 2010 Letter. Sandstone told Indemnity not to provide a defense. Sandstone had the right to make that choice as the insured. See Kajima, 879 N.E.2d at 309-10. Indemnity could not attempt to defend Sandstone in the Underlying Action. When Sandstone re-tendered the defense three years later, Indemnity promptly filed the 2014 Declaratory Action. When Sandstone sent the March 22, 2013 Letter tendering the defense under all the Indemnity Policies, Indemnity promptly

amended the 2014 Declaratory Action to include all the Indemnity Policies.  Indemnity did not waive its defenses.  Westfield and Star's arguments to the contrary are not persuasive.

Westfield and Star also argue that the <u>Cincinnati Companies</u> decision holds that a duty to defend arises on actual notice of a claim not on tender of the defense.  They argue that Indemnity's arguments about tender and re-tender do not matter because Indemnity's duty to defend was triggered by actual notice, not tender.  Westfield and Star again argue that Indemnity did nothing with respect to the Indemnity Policies other than the 08-09 Indemnity Policies.  Westfield and Star again argue that Indemnity thereby waived its defense of failure to comply with the policy notice provisions for the 09-10 Indemnity Policies and all subsequent Indemnity Policies.

These arguments are unpersuasive.  The <u>Cincinnati Companies</u> decision holds that an insurer with notice of a claim must defend unless the insured tells the insurer not to defend. <u>Cincinnati Companies</u>, 701 N.E.2d at 505.   Sandstone told Indemnity not to defend in the November 2, 2010 Letter.  After that date, Indemnity had no obligation to defend.  As explained above,

Sandstone's re-tender of the defense of the Underlying Action in the December 17, 2013 Letter was reasonable under the circumstances. Indemnity did not waive its defenses. Indemnity is obligated to pay a pro rata share of the defense costs with Westfield and Star, but Indemnity is not obligated to pay all of the defense costs.

Westfield and Star are also entitled to prejudgment interest since the December 17, 2013 re-tender. Illinois authorizes prejudgment interest at 5 percent per annum on any money due pursuant to a written contract. 815 ILCS 205/2. Prejudgment interest may be awarded under § 205/2 for sums due on insurance policies, including fees. This Court has discretion to decide whether to award prejudgment interest. Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co., 611 F.3d 339, 355 (7th Cir. 2010). Section 205/2 applies to actions by one insurer against another insurer for reimbursement of defense costs owed under insurance policies. Statewide Ins. Co. v. Houston General Ins. Co., 397 Ill.App.3d 410, 425, 920 N.E.2d 611, 623-24 (Ill App. 1st Dist. 2009). Prejudgment interest will generally be awarded on sums due under a written contract if the amount due is liquidated or easily ascertainable. New Hampshire Ins. Co. v. Hanover Ins. Co., 296 Ill.App.3d 701,

709, 696 N.E.2d 22, 28 (Ill. App. 1st Dist. 1998).  In this case, the sums are easily ascertainable from the submission by Westfield and Star.  Indemnity became obligated to pay its pro rata share of the fees and expenses on December 17, 2013.  The Court therefore will allow prejudgment interest accruing from December 17, 2013 on all fees and costs paid by Westfield and Star prior to that date, and prejudgment interest accruing from the dates Westfield and Star paid additional defense costs and fees thereafter.

The Court does not address whether Indemnity has a duty to indemnify Sandstone for covered losses.  The issue is not before the Court at this time because Sandstone prevailed at trial in the Underlying Action.  The only matter now at issue is Indemnity's duty to defend.

## CONCLUSION

**THEREFORE, Westfield Insurance Company's Motion for Summary Judgment (Case No. 14-3040 d/e 100, Case No. 16-3298 d/e 90) and Star Insurance Company's Motion for Summary Judgment (Case No. 14-3040 d/e 104, Case No. 16-3298 d/e 94) are GRANTED in part; and Indemnity Insurance Company of North America's Motion for Summary Judgment**

(Case No. 14-3040 d/e 102, Case No. 16-3298 d/e 92) is DENIED.  The Court enters partial summary judgment in favor of Westfield Insurance Company and Star Insurance Company and against Indemnity Insurance Company of North America. The Court declares that Indemnity Insurance Company of North America is obligated to pay a pro rata share of the defense cost of the Underlying Action with Westfield Insurance Company and Star Insurance Company.  The Court orders Indemnity Insurance Company of North America to reimburse Westfield Insurance Company and Star Insurance Company for a pro rata share of the defense costs paid to date by Westfield Insurance Company and Star Insurance Company, plus prejudgment interest at the statutory rate of 5 percent pursuant to 815 ILCS 205/2, as discussed above.

The Court directs the parties to meet, confer, and submit to the Court by November 30, 2019, an agreed calculation of the fees and costs paid by Westfield and Star to defend the Underlying Action, the pro rata share owed by Indemnity to Westfield and Star, and the appropriate amount of prejudgment interest.  If the parties cannot agree, each shall submit its

calculation with supporting evidence by November 30, 2019.
The Court will then resolve any disputes in the calculations
and enter the final judgment.

Defendant/Counter-Plaintiff Star Insurance Company's
original and corrected Motion to Strike Certain IINA Reply Brief
Arguments on Grounds of Improper Sandbagging or, in the
Alternative, for Leave to File a Sur-Reply to Those Arguments
(Case No. 14-3040 d/e 118, Case No. 16-3298 d/e 107 and 108)
are DENIED as moot.

ENTER:   October 25, 2019


_____
        s/ Sue E. Myerscough
**UNITED STATES DISTRICT JUDGE**